# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIM NICHOLAS JAMES,<br>    Plaintiff,<br><br>          v.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, et al.,<br>    Defendants. | CV 22-08468 DSF (SK)<br><br>Order GRANTING Motion for Remand (Dkt. 13) |

Plaintiff Jim Nicholas James moves to remand this action to Los Angeles County Superior Court. Dkt. 13 (Mot.). Defendants Twentieth Century Fox Film Corporation (Fox), The Walt Disney Company (TWDC), and ABC Signature Studios, Inc.'s (ABC) oppose. Dkt. 17 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, James's motion is GRANTED.

## I. BACKGROUND

In or around November 2018, James began working for Defendants Fox, TWDC, and ABC on various television and movie sets as a freelance lighting technician in Los Angeles county in California. Dkt. 1-2 (Compl.) ¶¶ 1-2. Since 2018, he has been authorized to work in the United States under a O-1 visa. Id. James worked for Defendants without issue from approximately November 2018 until February 6, 2021 on multiple productions. Id. ¶ 13. Starting on about February 6, 2021 through February 7, 2021, James began working on an ABC production called "Rebel." Id. ¶ 14.

On February 8, 2021, James received his hiring documents, including an I-9 verification. Id. The following day, Defendants requested copies of James's passport, social security card, and California driver's license for I-9 verification. Id. James then received a call from ABC's assistant production coordinator, Talia Fliegelman, who informed him that she had spoken to ABC and TWDC, and was told that they were not allowed to employ James. Id. James emailed her certain documents she requested and waited to hear back. Id.

ABC eventually told James that it would not be able to pay him on time because TWDC had not approved his O-1 petition. Id. ¶ 15. The next day, Fliegelman emailed all heads of departments for "Rebel" at TWDC and ABC stating that they could not hire any crew members working under O-1 visas. Id. James felt discriminated against and proceeded to involve his union, IATSE Local 728. Id. ¶16. After significant back and forth over a three-week period, Defendants paid James for his work on "Rebel" and allowed him to continue working on the production of season 5 of "This Is Us." Id. But Defendants threatened James with job loss on a daily basis and fabricated the narrative that Fox had been attempting to obtain a copy of his immigration paperwork since October 2020. Id.

On March 10, 2021, Defendants wrongfully terminated James on the basis that his O-1 petition entitled him to work only as a gaffer (head of lighting), not as a set lighting technician. Id. ¶ 17. On March 11, 2021, James filed a formal Step Two Union grievance, and a union meeting was scheduled for June 3, 2021. Id. ¶ 18. However, the meeting was continuously rescheduled. Id. Defendants eventually agreed to a Zoom meeting in February 2022. Id. ¶ 19. During the meeting, Defendants admitted that they had made mistake and misread a portion of James's visa. Id. They offered him the opportunity to return to the production of "This Is Us," which was ending production in May 2022. Id. They did not offer to provide him with backpay, or reimburse him for his immigration attorney's fees or other damages for the time he was out of work. Id. Defendants never contacted James, his immigration counsel, or his union following the Zoom meeting to discuss his return to "This Is Us." Id.

James alleges that Defendants have continued to red flag his name in their internal employee database which discredits him and prevents him from obtaining work with the companies Defendants own. Id. ¶ 20.  James has inquired with Fox, ABC, Hulu, and Disney about other job opportunities, but Defendants did not permit him to work after he submitted the start paperwork.  Id. ¶ 21.  James alleges that Defendants made defamatory statements about him, including statements that he was attempting to work in the United States illegally.  Id. ¶ 22.  They also published defamatory statements to third parties.  Id.  James also alleges that Defendants did not conduct a good faith investigation into his termination and failed to follow their policies and procedures.  Id. ¶ 25.  He alleges that their illegal actions have caused him emotional distress, monetary loss and have discredited his name and reputation in the industry.  Id. ¶ 20.

James alleges: (1) employment discrimination (Cal. Gov. Code § 12940(a)); (2) harassment (Cal. Gov. Code § 12940(j)); (3) retaliation (Cal. Gov. Code § 12940(h)); (4) failure to prevent discrimination, retaliation, and harassment (Cal. Gov. Code § 12940(k)); (5) wrongful termination in violation of public policy; (6) retaliation (Cal. Lab. Code § 1102.5); (7) defamation; and (8) intentional infliction of emotional distress.  Id. ¶¶ 27-90.  On November 11, 2022, Defendants removed the action from Los Angeles County Superior Court.  See Dkt. 1 (Notice).

## II. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction" and "possess only that power authorized by [the] Constitution and statute . . . ." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994).  A defendant may remove an action to federal court if the federal court could exercise subject matter jurisdiction over the action.  28 U.S.C. § 1441(a).  "The removal statute is strictly construed against removal jurisdiction" and "[t]he defendant bears the burden of establishing that removal is proper."  Provincial Gov't of Marinduque v. Placer Dome, Inc., 582 F.3d 1083, 1087 (9th Cir. 2009).  If a defendant fails to meet its burden of establishing subject matter jurisdiction, the suit must be

3

remanded. 28 U.S.C. § 1447(c). Generally, doubts as to removability are resolved in favor of remanding the case. See Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-109 (1941); Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992).

### III. DISCUSSION

Defendants assert that removal is proper based on federal question jurisdiction because: (1) James's claims "arise from and necessarily require interpretation of federal immigration laws as he alleges that Defendants' conclusions regarding his eligibility to work on certain television productions give rise to employment-related causes of action;" and (2) his claims "arise from or require the interpretation of one or more collective bargaining agreements (CBAs) that govern the terms and conditions of his alleged employment with Fox, TWDC, and ABC and are therefore preempted by Section 301(a)" of the LMRA. Notice at 1. James argues that Defendants misrepresent the substance of his claims, which are based solely on state law – the California Fair Employment and Housing Act (FEHA), the California Labor Code, and common law. Dkt. 13-1 (Mem.) at 1.

**A.   Federal Question Jurisdiction**

Defendants argue that removal on federal question jurisdiction grounds is proper when state law claims necessarily raise a stated, disputed, and substantial federal issue. Notice at 4. They contend that James's claims all raise a substantial federal issue – "whether Defendants committed any wrongdoing by concluding that, pursuant to applicable federal immigration laws, [James] was not eligible to work on certain television productions[.]" Id. at 4, 8. James counters that his right to relief under state law does not require the resolution of a substantial question of federal law. Mem. at 9. He contends that the federal immigration issue is a defense asserted by Defendants, not an element of his claim, and federal defenses cannot create removal jurisdiction. Id. at 8, 10.

For a state law claim to provide federal question jurisdiction under this theory, the "state law claim [must] necessarily raise a stated

4

federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005). "That is, federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn v. Minton, 568 U.S. 251, 258 (2013). "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the state claim 'necessarily raise[s]' a disputed federal issue, as Grable separately requires. The substantiality inquiry under Grable looks instead to the importance of the issue to the federal system as a whole." Id. at 260. "[T]he mere use of a federal statute as a predicate for a state law cause of action does not necessarily transform that cause of action into a federal claim . . . ." Nevada v. Bank of America Corp., 672 F.3d 661, 675 (9th Cir. 2012). Nor does "the question whether a particular claim arises under federal law depend[] on the novelty of the federal issue." Id. (quoting Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 817 (1986)).

"Only a few cases have fallen into this 'slim category'," including: "(1) a series of quiet-title actions from the early 1900s that involved disputes as to the interpretation and application of federal law . . . (2) a shareholder action seeking to enjoin a Missouri corporation from investing in federal bonds on the ground that the federal act pursuant to which the bonds were issued was unconstitutional . . . and (3) a state-quiet title action claiming that property had been unlawfully seized by the [IRS] because the notice of the seizure did not comply with the Internal Revenue Code." City of Oakland v. BP PLC, 969 F.3d 895, 904 (9th Cir. 2020) (citations omitted). "In other cases where parties have sought to invoke federal jurisdiction for state-law claims, the Court has concluded that jurisdiction was lacking, even when the claims were premised on violations of federal law." Id. (citations omitted). Moreover, "[b]ecause federal jurisdiction 'depends solely on the plaintiff's claims for relief and not on anticipated defenses to those

5

claims,' 'a case may not be removed to federal court on the basis of a federal defense . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.'" Id. at 903-04.

The federal immigration issue Defendants raise is part of their defense, rather than an issue in James's claims. Defendants also fail to show that this case raises substantial questions important to "the federal system as a whole." It is clear that it does not. The Court finds that Defendants have not established that James's state law claims arise under federal law.

## B.   LMRA Preemption

Defendants argue that James's state law claims are completely preempted under Section 301 of the Labor Management Relations Act (LMRA), and therefore arise under federal law. Notice at 4, 9-18. They assert that James sought to be employed as a gaffer or set lighting technician, and at all relevant times, the International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada (IATSE) and its bargaining unit, Local 728, represented James and was his exclusive bargaining representative. Id. at 6-7. Defendants assert that two CBAs govern the terms and conditions of James's employment: an August 1, 2018 Agreement (2018 Agreement) and an August 1, 2021 General Memorandum of Agreement. Id. at 7. They argue that James's causes of action require interpreting the CBAs. Id. at 8. They also contend that the right he seeks to enforce exists solely as a result of the CBA, and therefore his claims are preempted. Id.

For the Court to have federal question jurisdiction over a complaint, the complaint must arise under federal law. 28 U.S.C. § 1331. Ordinarily, "[t]o determine whether the claim arises under federal law, [courts] examine the 'well pleaded' allegations of the complaint and ignore potential defenses." Beneficial Nat. Bank v. Anderson, 539 U.S. 1, 6 (2003). However, there is an exception to the

well-pleaded complaint rule for federal statutes that completely preempt a plaintiff's state law claims. Id. at 8.

Section 301(a) provides federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). "The preemptive force of section 301 is so powerful as to displace entirely any state claim based on a collective bargaining agreement, and any state claim whose outcome depends on analysis of the terms of the agreement." Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 997 (9th Cir. 1987) (citations omitted). If a state law claim is completely preempted by Section 301, the state law cause of action necessarily becomes a federal one and can be removed. Milne Employees Ass'n v. Sun Carriers, 960 F.2d 1401, 1406 (9th Cir. 1991), as amended on denial of reh'g (May 4, 1992).

To determine if a claim is preempted by Section 301, courts apply a two-step test. First, the court asks "whether a particular right inheres in state law or, instead, is grounded in a CBA." Matson v. United Parcel Serv., Inc., 840 F.3d 1126, 1132 (9th Cir. 2016) (quoting Burnside v. Kiewit Pac. Corp., 491 F.3d 1053, 1060 (9th Cir. 2007)). If the claim is founded directly on rights created by a CBA, preemption is warranted. Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987). The second part of the test asks "whether a state law right is 'substantially dependent' on the terms of a CBA." Matson, 840 F.3d at 1132. In doing so, the key question is "whether the claim can be resolved by 'looking to' versus interpreting the CBA." Id. If the claim requires "interpretation" of the CBA, it is preempted; if it requires only "looking to" the CBA, it is not. Id. Interpretation, in this context, is defined narrowly and "it means something more than 'consider,' 'refer to,' or 'apply.'" Id. "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Livadas v. Bradshaw, 512 U.S. 107, 124 (1994). Further, "[i]f the claim is based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." Matson, 840 F.3d at 1132.

7

James argues that his claims do not depend on any rights conferred on him by a CBA.  Mem. at 15.  He asserts that Defendants' reliance on a CBA as an aspect of their defense is not enough to inject a federal question into an action that asserts state law claims.  Id. at 15.  He contends that "the LMRA does not preempt discrimination claims under FEHA because the rights created thereunder are nonnegotiable and independent of right under a CBA."  Id. at 16.

The Court agrees with James that his claims do not depend on rights conferred on him by the CBAs.  Defendants assert that James argues that his right to work from "job to job" arises from the CBAs and that he seeks to enforce a particular right that exists because of the CBAs, Notice at 8, but then they also state in their opposition that they are not relying on this argument, Dkt. 17 (Opp'n).  Either way, Defendants mischaracterize the right at issue.  James's claims are not based on the right to work from "job to job."  James's state law claims are not founded on rights created by CBAs – the rights exist independent of the terms of the CBAs.  See, e.g., Armstrong v. WB Studio Enters., Inc., No. CV 19-9587-GW-JPRx, 2020 WL 1967566, at *3 (E.D. Cal. Apr. 24, 2020) (stating that FEHA harassment, discrimination, retaliation, and failure to prevent claims, and a claim alleging a violation of Cal. Labor Code § 1102.5 are state law claims that do not explicitly invoke CBAs); McGowen v. Nestle Food Co., No. 1:06 CV 01212 AWI DLB, 2007 WL 173768, at *3 (E.D. Cal. Jan. 19, 2007) ("The Ninth Circuit has also held on several occasions that the LMRA does not preempt discrimination claims under FEHA because the rights created thereunder are nonnegotiable and independent of rights under a CBA.") (collecting cases).

The Court considers whether the resolution of the case is "substantially dependent on analysis" of the CBAs.  See Burnside v. Kiewit Pac. Corp., 491 F.3d 1053, 1059 (9th Cir. 2007).  Defendants argue that all of James's claims will require interpreting provisions of the CBAs in order to determine: (1) whether he was qualified for the position he sought or was performing, (2) whether he was terminated or whether his fixed daily or weekly employment simply expired and was not renewed, (3) whether Defendants had a legitimate business reason

8

for their actions, and (4) whether Defendants were required to conduct an investigation following James' alleged termination. See Notice at 9-18. Id. They identify paragraphs 6 and 68 of the 2018 Agreement as provisions that will require interpretation. Id. at 11, 15.

Paragraph 6 of the 2018 Agreement, entitled "Minimum Calls," states in relevant part:

> (a) The minimum call is a guarantee of employment for the number of hours of the minimum call indicated in the wage schedules.
>
> The parties hereby confirm the following: The guaranteed length of employment shall be daily or weekly. A guarantee for a longer term shall be specifically set forth in writing. An employee may be replaced following completion of the guaranteed period of employment.

Dkt. 5 (Jun Decl.), Ex. A (2018 Agreement) at 27.[1]

Article 68 of the 2018 Agreement is entitled "Seniority" and generally addresses the maintenance of an "Industry Experience Roster" and a "Studio Experience Roster," preferential employment

---

[1] Defendants do not refer to the following paragraphs of the CBA, but the Court finds them relevant. Paragraph 2(a) of the 2018 Agreement, entitled "Classification and Wage Schedule," provides:

> Each employee shall be notified at the time of his employment under which classification and wage schedule he is employed. He shall also be notified before any change of classification or wage schedule is effective and such change shall not be retroactive. However, employees may be adjusted retroactively when misclassified. The employee's classification and wage schedule shall be shown on his time card.

2018 Agreement at 26. Paragraph 12, entitled "Interchange of Job Classifications," states in relevant part that "[a]ny employee may be required to perform work in any job classification listed in the wage scale (Paragraph 1)." Id. at 43. The wage scales in Paragraph 1 identify various classes of studio electrical lighting technicians. Id. at 18-24.

9

treatment for qualified individuals, the removal of individuals from the roster, and related arbitration procedures. Id. at 79-91. Paragraph 68(a) states in part:

> Under prior collective bargaining agreements, signatory Producers have established an Industry Experience Roster, which will be maintained under this Agreement, composed of the names of employees subject to this Agreement, who were included on said roster on July 31, 2018 and employees who thereafter satisfactorily fulfill all of the eligibility provisions set forth under "Entry Level Classification" below, including employees who actually performed services hereunder in one or more of the job classifications covered by this Agreement in the production of motion pictures in the motion picture industry in Los Angeles County or who have been hired hereunder in said County and performed such services outside said County.

Id. at 79. Paragraph 68(b) states, "Producer has established and will maintain, as herein provided, a Studio Experience Roster, referred to as the 'Studio Roster,' composed of those persons subject to this Agreement who were on the Studio Experience Roster in Industry Group 1 as of February 1, 1976." Id. at 80. Paragraph 68(c), entitled "Hiring, Layoff and Rehire," states in part:

> Producer shall give preference of employment to qualified available persons in the job classifications hereunder as follows:
>
> (1) In the job classifications hereunder, except the classification of Chief Lighting Technician, such preference of employment in hiring and rehiring shall be first given to such qualified persons in the Studio Roster group; in the event that there are insufficient available qualified persons in the Studio Roster group to meet the employment needs of the Producer in such job classifications, the next preference shall be given to persons listed on the Industry Experience Roster in the Journeyman or Entry Level classifications; in the event there are insufficient available qualified persons listed on the Industry Experience

10

>Roster in such classifications, the Producer may secure employees from any source.

Id. at 80-81.

James argues that his case will not turn on the Court's interpretation of a CBA. Mem. at 18. He argues that he is asserting national origin claims against Defendants that do not require interpretation of the CBA. Id. He asserts that he is not alleging a right to work from "job to job," rather he takes issue with Defendants' decision to "randomly" terminate him in the middle of a job he was working on. Id. James asserts that he is alleging that he faced national origin discrimination that is evidenced by Defendants' statements and conduct toward non-U.S. citizens. Id. The Court agrees with James. Defendants have not met their burden of establishing that removal is proper.

## IV. CONCLUSION

James's motion for remand is GRANTED. The case is REMANDED to the Superior Court of California, County of Los Angeles.

IT IS SO ORDERED.

Date: January 31, 2023

_____
Dale S. Fischer
United States District Judge